# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| JOHN BRAXTON DIXON, | ) |
|     Plaintiff, | ) |
| | ) Civil Action Number |
| v. | ) |
| | ) |
| MORRIS-SHEA BRIDGE COMPANY, INC., | ) |
| | ) PLAINTIFF DEMANDS A |
|     Defendant. | ) TRIAL BY STRUCK JURY |

## COMPLAINT

### JURISDICTION AND VENUE

1. This is a suit to obtain relief for violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.* arising from unpaid wages and overtime.

2. The jurisdiction of the court is invoked pursuant to 28 U.S.C. §1337 and 29 U.S.C. § 201, *et seq.*

3. Venue is proper because the Defendant employed the Plaintiff in Jefferson County, Alabama.

### PARTIES

4. Plaintiff John Braxton Dixon was more than 19 years old at the time of the

1

events giving rise to this action and is a resident of Shelby County, Alabama.

5. Defendant Morris-Shea Bridge Company, Inc. ("MSBC") is a domestic corporation with its principal address in Irondale, Alabama.

6. MSBC is a deep foundation contractor working in heavy civil, industrial, and marine construction markets throughout the country and abroad.

7. MSBC engages in interstate commerce.

8. MSBC has gross annual receipts more than $500,000.

9. MSBC is an employer for purposes of the FLSA.

## COUNT I
## FAIR LABOR STANDARDS ACT
(Unpaid Wages and Overtime)

10. Plaintiff adopts and incorporates the factual averments above in support of this count.

11. MSBC hired Mr. Dixon in January 2013 to work as its Facilities Accounting Manager.

12. During the events relevant to this action, Mr. Dixon reported to Steve Shea[1] and Mike McPhillips.

13. Initially in 2013, Mr. Dixon supervised two employees and was responsible for approving all invoices and bills.

---

[1] All references herein to Mr. Shea are to Steve Shea.

14. In 2013, MSBC paid Mr. Dixon an annual salary.

15. However, in December 2017, MSBC changed the nature of Mr. Dixon's employment.

16. In December 2017, MSBC reclassified Mr. Dixon from salaried employee to being an hourly field employee.

17. In December 2017, Mr. McPhillips told Mr. Dixon that his salary of $70,000 would be divided by 50 hours to come up with an hourly rate of $26.923.

18. Mr. McPhillips told Mr. Dixon that Mr. Dixon would be required to work fifty to sixty hours a week on average, but that Mr. Dixon should only turn in 50 hours a week on his handwritten timesheet.

19. Mr. McPhillips told Mr. Dixon he would not be paid for any time Mr. Dixon worked over fifty hours a week.

20. Mr. McPhillips told Mr. Dixon that in terms of the time clock, Mr. Dixon was to punch in and out, and once Mr. Dixon hit fifty hours for the week, Mr Dixon was to clock out but continue working.

21. All time MSBC paid to Mr. Dixon after December 2017 was "straight" time.

22. After December 2017, MSBC did not pay Mr. Dixon at a rate of time-and-a-half for any time that he worked over 40 hours a week.

23. In December 2017, MSBC prepared a Payroll Change Notice ("PCN")

changing Mr. Dixon's compensation structure from salary to hourly.

24. Mr. Dixon had access to MSBC's Computer Ease Accounting System and saw in the payroll module the notes documenting the receipt of the PCN changing him from salary to hourly.

25. In 2018, MSBC began reducing and taking away Mr. Dixon's accounting and supervision responsibilities.

26. Starting in 2018, MSBC changed Mr. Dixon's duties such that with the exception of approving invoices, the work he performed was more like a clerk and/or personal assistant.

27. In 2020, MSBC moved Mr. Dixon from his office to the reception desk where he performed work as the receptionist as well as his regular work.

28. During the events relevant to this action, Mr. Dixon sent daily email reports of his work for the day to Mr. Shea and Mr. McPhillips.

29. Mr. Dixon's daily email reports were sent at the end of the day, frequently close to or after 6:00 pm.

30. MSBC required Mr. Dixon to report to work by 7:00 am.

31. Through Mr. Dixon's daily email reports, Mr. Shea and Mr. McPhillips knew or should have known each day that Mr. Dixon was working eleven hours or more per day but was only being paid for ten hours.

4

32. By 2018, Mr. Dixon was no longer making supervisory decisions.

33. However, Mr. Dixon continued to communicate supervisory instructions from Mr. McPhillips or Mr. Shea to other employees.

34. Mr. Dixon did not have the power to hire employees.

35. Mr. Dixon did not have the power to make the decision to fire employees.

36. However, Mr. Dixon communicated termination decisions made by Mr. McPhillips or Mr. Shea to employees.

37. Mr. Dixon did not have the power to make the decision to issue employee discipline.

38. However, Mr. Dixon communicated disciplinary decisions made by Mr. McPhillips or Mr. Shea to employees.

39. By 2020, most of Mr. Dixon's duties consisted of running hot shot runs or errands for his supervisors, doing temperature checks for COVID-19 screenings, and making sure the facility was locked at the end of the workday.

40. MSBC laid Mr. Dixon off from work in September 2020.

41. MSBC has not recalled Mr. Dixon to work.

42. The nature of Mr. Dixon's duties from December 2017 to his layoff in September 2020 would not entitle MSBC to any type of exemption under the

32. By 2018, Mr. Dixon was no longer making supervisory decisions.

33. However, Mr. Dixon continued to communicate supervisory instructions from Mr. McPhillips or Mr. Shea to other employees.

34. Mr. Dixon did not have the power to hire employees.

35. Mr. Dixon did not have the power to make the decision to fire employees.

36. However, Mr. Dixon communicated termination decisions made by Mr. McPhillips or Mr. Shea to employees.

37. Mr. Dixon did not have the power to make the decision to issue employee discipline.

38. However, Mr. Dixon communicated disciplinary decisions made by Mr. McPhillips or Mr. Shea to employees.

39. By 2020, most of Mr. Dixon's duties consisted of running hot shot runs or errands for his supervisors, doing temperature checks for COVID-19 screenings, and making sure the facility was locked at the end of the workday.

40. MSBC laid Mr. Dixon off from work in September 2020.

41. MSBC has not recalled Mr. Dixon to work.

42. The nature of Mr. Dixon's duties from December 2017 to his layoff in September 2020 would not entitle MSBC to any type of exemption under the

FLSA because Mr. Dixon was not supervising anyone, not exercising significant discretion, nor having input on hiring/firing/discipline.

43. Based on the information available to Mr. Dixon, he is conservatively owed approximately $37,967.16 in unpaid wages and overtime.

44. From 2018 to the present, MSBC has been aware that the FLSA requires it to pay workers for all work performed.

45. From 2018 to the present, MSBC has been aware that the FLSA requires it to pay non-exempt workers at a rate of time-and-a half for work performed in excess of 40 hours a week.

46. When MSBC did not pay Mr. Dixon for all the work he performed, the company knew it was not complying with the FLSA.

47. When MSBC did not pay Mr. Dixon at a rate of time-and-a half for work performed in excess of 40 hours a week, it knew it was not complying with the FLSA.

48. MSBC's violation of the FLSA was willful.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff respectfully requests the entry of a judgment against the Defendant pursuant to an order by which the court:

    a.    awards unpaid wages and overtime compensation damages;

b.  awards liquidated damages;

c.  awards injunctive relief;

d.  awards that relief which is fair, reasonable, and just under the circumstances;

e.  awards a reasonable attorney's fee; and

f.  taxes the costs of this suit against the Defendant.

**THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

*/s/ Heather Newsom Leonard*
Heather Newsom Leonard
ASB-1152-O61H
ATTORNEY FOR PLAINTIFF

OF COUNSEL:

HEATHER LEONARD, P.C.
2105 Devereux Circle, Suite 111
Birmingham, AL 35243
(205) 977-5421 - voice
(205) 278-1400 - facsimile

SERVE DEFENDANT BY CERTIFIED MAIL:

Morris-Shea Bridge Company, Inc.
Richard J. Shea, Registered Agent
609 S 20th Street
Irondale, AL 35210